## THE AURORA.

(District Court. D. Oregon. April 4. 1910.)

### No. 4,891.

**1. Shipping (§ 84*)—Liability for Injury—Unsafe Passage to Work.**

A vessel was lying at a wharf loading lumber; her decks being from 16 to 20 feet below the level of the wharf. To enable the longshoremen doing the loading to reach the vessel, the master ran a plank a foot wide from the wharf to one of the ratlines in the rigging, and libelant's intestate, who was one of the workmen, fell from such plank to the deck, and was killed. The ship had a gangplank which could have been used and would have been safe, but the master used the plank as more convenient. It was not lashed and apparently tipped up edgewise, causing the fall. *Held*, that the master did not use proper care in the matter for the safety of the employés, and that the vessel was liable for the death.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 342, 349–351; Dec. Dig. § 84;* Master and Servant, Cent. Dig. § 492.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. SHIPPING (§ 84*)—MASTER'S LIABILITY FOR INJURY—ASSUMPTION OF RISK.

The plank having been in use but a day or two at the time of the accident, plaintiff's intestate could not be charged with assumption of the risk in using it.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 342, 349–351; Dec. Dig. § 84;* Master and Servant, Cent. Dig. § 492.]

3. DEATH (§ 95*)—AMOUNT.

An award of $3,500 damages made for the death of a longshoreman 35 years old and earning about $60 per month.

[Ed. Note.—For other cases, see Death, Cent. Dig., §§ 108–115, 120; Dec. Dig. § 95.*]

In Admiralty. Suit by Maggie Boyce, administratrix of the estate of William Boyce, deceased, against the barkentine Aurora, the Aurora Shipping Company claimant. Decree for libelant.

See, also, 163 Fed. 633.

Giltner & Sewall, for libelant.

Ralph W. Wilbur and William C. Bristol, for respondent and claimant.

WOLVERTON, District Judge. This is a libel to recover damages on account of the death of William Boyce, alleged to have been caused through the negligence of the officers and agents of the barkentine Aurora. On December 21, 1906, the Aurora was, and had been for a week prior thereto, loading lumber from a sawmill and wharf adjoining at St. Johns, Multnomah county, Ore. The vessel is 240 feet in length, and it was necessary to change her mooring as convenience demanded for loading. The men engaged in loading were longshoremen employed for the purpose. Among them was William Boyce, the decedent. In providing a way for the men to pass to and from the shore, a plank 12 inches wide, 2 inches thick, and about 14 feet long was laid from the wharf to a ratline in the spanker rigging. The ratlines are made of oak wood an inch square, and run across from backstay to backstay, forming a ladder running from the ship's deck up into the spanker rigging. When, therefore, the plank was laid from the wharf to the spanker rigging, it afforded a way, in connection with the ladder, for reaching and passing from the deck. The negligence charged against the Aurora is in providing the plank, in the manner described, without lashing the ends thereof to make it secure, when there was on board at the time a gangplank three feet wide, equipped with hand ropes and cleats, which could have been used, and was safe for use, by extending the same from the wharf to the deck of the vessel. The distance from the wharf over the plank to the spanker rigging was from six to ten feet, probably nearer the latter figure. While passing from the wharf to the ship, Boyce fell from this plank to the deck below, and was killed. Boyce was employed at the time in stowing lumber in the ship's hold. He was returning from luncheon, and was some three minutes late in going aboard; it being about three minutes after 1 p. m. A sling load of lumber was being lowered at the time, the first to be lowered after luncheon.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

William Gynther was an eyewitness to the accident. He relates that Boyce, while walking aboard over the plank, and when near to the rigging, reached out for the backstays to get a foothold, and that just then the plank tipped up edgewise, and Boyce fell off the side. He fell about 16 feet to the after deck, and glanced from that to the deck below. The witness further states that, when he came aboard in the morning, the plank was shaking and unsteady, and that he then warned the mate that it was not "safe to come aboard" on. At the same time witness suggested that the vessel had a good companionway, and asked him why he did not use that, to which the mate made reply, in substance, that the plank was good enough, but further said that he would make it fast, and have it done before dinner.

C. Hansen, called for the respondent, and the only other witness who claims to have seen the mishap, testifies that he saw Boyce approaching the gangplank from the wharf; that he was "staggering a bit"; that he stepped upon the plank, and leaned toward the rigging, and, when he brought his other foot forward, he slipped off the side of the plank, and fell to the poop deck, and from there upon the main deck. Later he says Boyce "had his right foot on first, and his left foot slipped. It didn't touch the plank at all; and he grabbed for the rigging. He had his hand on the rigging, too, but he could not get hold of it. He slipped some way or another, and he went down. * * * He stepped behind the plank. I don't think it (his foot) touched that plank." He further says he did not see the plank tip up. As to whether it was safe to use such a plank for the purpose for which this one was used, the witness says that it was all right for men used to that kind of work, but that it was not safe for passengers. He was unable to say whether Boyce was drunk or not. It further appears from his testimony that the waves coming to shore from passing boats would rock the vessel a little, and that the action of the donkey engine in lifting a heavy load would rock it more.

Witnesses disagree as to the number of times the vessel was moved at the wharf while loading prior to the accident. Hansen says several times, but Knutsen and Cook both say that it was moved but once, and that was the day, or the day but one, before the accident. I am inclined to give the larger credit to the latter witnesses as to this. Cook saw Boyce from 20 to 30 minutes before he was hurt, and Coleman saw him from three to five minutes before, and they each say he was sober at the time. Gynther's testimony is also corroborative of this.

H. Samuelson, the captain of the Aurora, testifies that he employed Boyce; that he ordered the plank placed in position for use by the men in going to and from the vessel; that his reason for so doing was that the ship was moved frequently, and that it was further inconvenient to use the ship's gangway, because the incline from the wharf to the boat was very steep, and the wharf was more or less blocked with lumber from time to time. Samuelson makes some intimation that he had ordered Boyce discharged, but refrains from saying that such was the case. He further intimates that Boyce was drunk, but this is not verified. It appears that the main deck of the ship was about 20

feet lower than the wharf, and the poop deck about 16 feet lower, and the regular gangplank could undoubtedly have been used, but it was thought by the captain more convenient to use the plank running to the spanker rigging. The incline of the regular gangplank, the same being 30 feet in length, would have been less than 45 degrees if running to the main deck, and much less than that if running to the poop deck.

From a careful survey of the whole testimony, I am of the opinion that it was negligence on the part of the respondent in providing the temporary gangplank, without lashing to the ratline upon which it rested, to make it steady and prevent its tipping by use. The ship was moving more or less by action from the waves and the donkey engine, and, at best, the plank would have been none too secure if tightly lashed to the ratline. Furthermore, I see no reason why the ship's gangplank was not used for the purpose. The declivity from the wharf to the vessel's deck was certainly not a reasonable objection, and, as for the lumber being in the way on the wharf, the gangplank might have been moved every morning, noon, and evening hour with but little trouble. The safety of the workmen surely demanded greater care and precaution than was exercised by the captain and those having the management of the loading of the vessel. It is claimed, however, that Boyce was himself negligent, because drunk. This charge is wholly unproven. In fact, the contrary seems to have been the case—that Boyce was duly sober at the time.

The further defense is urged of assumption of risk on the part of Boyce. This cannot be maintained, as the plank had not been used more than a day in the position it was found to be in at the time of the accident, or two days at the outside. Workmen are not supposed to examine with minuteness passageways of the kind provided for their use, and most persons would not stop to see whether such a plank was lashed or not. Unless the danger was palpable and fully appreciated, or should have been so appreciated by a prudent exercise of the senses, and the workmen notwithstanding used the way, there could be no assumption of risk. It cannot well be maintained that Boyce was subject to these conditions. It is the bounden duty of the employer to furnish the employé with a safe place in which to work, and, in the present instance, to furnish the workmen with safe ingress and egress to and from their work, and it seems to me that it is carrying the doctrine of assumed risk very far to say, "It is true I have provided an unsafe and insecure passageway, but the workman, by using it, has assumed all the risk of danger ensuing from the use." The doctrine goes far to relieve the employer of his first and primary duty, and it ought to be a clear case that will thus shift the responsibility.

The further question is presented that this court is without jurisdiction of the cause. This, however, has been determined against the contention on exceptions to the libel. See The Aurora (D. C.) 163 Fed. 633, and Jennie Williams v. The General Foy, a later case (D. C.) 175 Fed. 590.

The amount of libelant's recovery is the next consideration. The administratrix testified that Boyce earned about $60 per month, but further than this nothing is shown as to his habits of industry and

frugality, and what proportion of his earnings he was able to save and accumulate. There is a dearth of information upon the subject. The deceased was 35 years old, and his expectancy of life about 36 years. In the case of the Oregon Round Lumber Co. v. Portland & Asiatic Steamship Co. et al. (D. C.) 162 Fed. 912, where the decedent was 31 years, with an expectancy of 34 years, it being shown that he was able to accumulate $250 per year, the court allowed $3,660 and legal interest from the date of the accident. The case here is not so clear as that, and it is very doubtful whether Boyce's capacity to accumulate was as good as the decedent's there. The measure of damages is solely what Boyce's estate has lost by his death.

I will allow $3,500, with interest at the legal rate from the date of the accident, and this, with costs, will be the amount of libelant's recovery.